## Thomas & Smith, Appellants, v. Chicago Pump Company, Appellee.

### Gen. No. 17,000.

1. PATENTS—*royalties prior to issuance.* An inventor constructed, in consideration of royalties to be paid for the use of an invention, to give a manufacturer the exclusive right to use and sell the invention during the life of the patent and to obtain letters patent as soon as possible. The first annual settlement was to be made on a certain day whether patents had been issued or not, and on such day the manufacturer agreed to give an accounting, though patents had not been issued. *Held,* that both from a construction of the contract based upon the acts of the parties and from the contract itself, the inventor was entitled to royalties on sales prior to the issuance of the patents.

2. SALES—*when purchaser may remedy defects and recover under warranty.* Where a manufacturer guaranties that the material and workmanship of a pump is the very best and that he will replace defective parts, if a purchaser from the manufacturer gives notice of defects, and no attention is paid thereto, he may remedy the defects and recover the costs of the materials and labor.

Appeal from the Municipal Court of Chicago; the Hon. JOHN H. HUME, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Affirmed. Opinion filed October 3, 1912. Rehearing denied October 17, 1912.

JOHN T. BOOZ, for appellant.

WHITMAN & HORNER, for appellee; LLOYD C. WHITMAN, of counsel.

MR. JUSTICE FITCH delivered the opinion of the court.

This is an appeal from a judgment for $23.38 in favor of appellee, and involves the construction of certain contracts. Appellant brought suit against appellee to recover the price of certain "automatic bilge pumps" sold and delivered by appellant to appellee. The plaintiff's claim, as filed, was for $1,594.66, and

upon the trial it was conceded by the defendant that plaintiff was entitled to recover that amount less certain allowances, which were not contested by plaintiff, amounting to $160.21. Appellee filed a set-off claiming an amount due from plaintiff in excess of the plaintiff's claim. Upon a trial before the court, without a jury, the trial court found the following items due from plaintiff to defendant, viz: For damages on account of defects in certain of the pumps sold by plaintiff to defendant, $291.57; for unpaid royalties accrued under the provisions of the contracts hereinafter mentioned, $1,119.50; and gave judgment for the difference between the amount conceded to be due to plaintiff, and the aggregate of the two items due the defendant, as above stated. The first item of the set-off was allowed by the court upon the theory that the pumps sold were warranted by plaintiff, who was the manufacturer thereof, and the second item was allowed upon the theory that the contracts provide for the payment of royalties to appellee upon all automatic switches manufactured by the plaintiff and sold and delivered prior to July 1, 1908, and upon all pumps manufactured and sold prior to the cancellation of the pump contract. Appellant denied appellee's right to recover anything, and the action of the court below in allowing the items of set-off presents the only real question in this case.

The following facts were either conceded or were not seriously disputed: In May, 1907, and prior thereto, Thomas and Smith, doing business as a partnership, were engaged in the manufacture of heating and ventilating systems, hot air pumps, and other machinery. Maurice I. Weil was a salesman in their employ. Augustus C. Durdin, Jr, was the inventor of an automatic pump and an automatic switch. Weil had an interest in Durdin's invention of the bilge pump but no interest in the invention of the switch. No patents for these inventions had as yet been obtained, but

Durdin and Weil had consulted a patent lawyer and expected to obtain them in due course. On May 9, 1907, Durdin and Weil, as inventors and joint owners of the pump invention, made a written proposition to Thomas & Smith regarding the use, manufacture and sale of the automatic bilge pumps invented by Durdin, and at the same time Durdin, as inventor of the automatic switch above mentioned, made a similar proposition in writing for the use, manufacture and sale of such switches. Both propositions, after some minor changes in the phraseology of some of the specified conditions, were accepted by Thomas & Smith on May 15, 1907. The language of the first paragraph of each of the propositions as accepted, is the same. That portion of the pump contract reads as follows:

"GENTLEMEN:

In consideration of the following royalties to be paid us for the use of an automobile bilge pump and motor combined, we hereby agree to give you, your successors or assigns, the exclusive right to use, manufacture and sell this automatic bilge pump and motor combined during the patent term, and to cover same as soon as possible by letters patent in and for the United States of America and Canada. Also the exclusive right to use, manufacture and sell any improvements thereon or any other automatic bilge pump and motor combined or improvements thereon invented by us or either of us during the life of said United States patent and to cover same by letters patent in said United States and Canada, the exclusive use of improvements or of any new automatic bilge pump and motor combined and improvements thereon to continue during the life of the letters patent secured thereon."

In the contract for the manufacture and sale of the automatic switch the consideration is expressed in the following words:

"In consideration of the following royalties to be paid me for the use of an automatic switch to be used in connection with your compression water systems I hereby agree to give you, your successors or assigns,

the exclusive right to use, manufacture and sell this automatic switch during the patent term, and to cover same as soon as possible by letters patent, etc.''

The royalties specified in each of said contracts are fixed on a sliding scale according to the number of pumps or switches sold during each year, the royalties on the sale of pumps being fixed at $15 each for yearly sales of fifty or less, and diminishing to $5 for each pump on yearly sales of 400 or more. In like manner the royalties upon the sale of switches were fixed at $8 each for yearly sales of fifty or less, and diminishing to $1.85 each, in case of yearly sales aggregating 3,000 switches or more.

On the same day that these contracts were executed, Durdin entered the employ of Thomas & Smith under a written contract which provides that Durdin is employed as engineer and to take charge of their pump department at a salary of $1,500 the first year; that Durdin is to invent such machinery as appellant's business will require from time to time and see that the same is properly manufactured, and take such charge and direction of the electrical installations of appellant as may be assigned to him; that appellant shall have the right to own, and to secure patents for any invention Durdin may make, or any ideas he may receive, in connection with the business, except improvements in the automatic switch and bilge pump, which are to be governed by the prior agreements of the same date between the parties. Durdin continued in the employ of appellant from June 1, 1907, to October 23, 1909. Soon after the latter date he became secretary and director of the Chicago Pump Company, appellee, a corporation organized by Weil, and at that time substantially in his control. It was stipulated on the trial that the partnership of Thomas & Smith are now the corporation known as Thomas & Smith, and that Durdin and Weil are now the Chicago Pump Company; that the two corporations are to be treated

as principals, whether as parties to the various contracts involved, or as parties who have assumed the obligations of such contracts, except that appellant does not admit that there was any legal assignment to the Chicago Pump Company of Durdin and Weil's claim for royalties. As to the exception, it was shown that the claim for royalties was first orally assigned by Durdin and Weil to the Chicago Pump Company, and that a formal written assignment thereof was executed on the same day this suit was brought, but before the *præcipe* was filed in the Municipal Court.

Each of the royalty contracts contains the following provision: "Settlement of all royalties shall be made annually, and you (appellant) shall make full and true returns to us (Durdin and Weil) in writing annually during the month of July, beginning July, 1908. * * * Should you at any time fail to pay the royalties above mentioned within thirty days after such returns are made as above, or fail to make prompt and true returns as above provided, then this license shall, at our option, be void, and your rights herein cease and determine. Such option shall be exercised by giving you notice in writing of such termination." It also appears, without contradiction, that about June 1, 1907, Durdin made drawings of the automatic switch on appellant's time, had some patterns made, and appellant soon after began the manufacture of the same; and that during March and April, 1908, Durdin made drawings of the bilge pumps, and that appellant began to manufacture the same in May, 1908, the first one being completed in June, 1908; that Durdin applied for a United States patent on the bilge pump on May 12, 1908, and a patent was issued on August 10, 1909; that no application was ever made for a Canadian patent for the bilge pump; that Durdin made application for a Canadian patent on switches September 5, 1907, and a patent issued therefor November 5, 1907; that the United States patent for switches was issued March 30, 1909.

Appellant's counsel contend that by the terms of the contracts in question, appellant was given the exclusive right to use, manufacture and sell the inventions of Durdin "during the patent term," which term, it is said, had a fixed time of beginning, viz: The date of the issuance of the patents, and a fixed duration, viz: The life of such patents; that although both switches and pumps were admittedly manufactured and sold by appellant prior to the issuance of the patents, nevertheless, it is said, no royalties accrued to appellees thereon, because of this language in each of the contracts; and that, therefore, the trial court erred in allowing appellee any sum for royalties upon pumps and switches sold before the patents issued. To this contention appellee's counsel reply that the contracts are ambiguous in this respect, and that the understanding of the parties in relation thereto, as evidenced by their acts, should be given effect, unless a construction based upon such acts is so contrary to the language of the contracts that it would do violence to the meaning of the terms expressed in the contracts. It was shown that sixty-one or sixty-three switches were manufactured and sold by appellant, of which forty-seven were manufactured and delivered prior to March 30, 1909, when the United States patent issued; that exclusive of the bilge pumps sold to appellee, forty-two were manufactured by appellant, of which thirty-three were sold and delivered prior to August 10, 1909, when the United States patent on bilge pumps issued; that twenty-nine or thirty were sold and delivered by appellant prior to July 1, 1908, and, as we understand the evidence, only two bilge pumps were sold and delivered by appellant prior to July 1, 1908. Durdin testified that about July 1, 1908, he reminded Thomas that the first year for royalties to be paid on switches and bilge pumps had expired, and asked Thomas to have his bookkeeper prepare a statement of the number of switches and pumps sold; that

Thomas replied that his bookkeeper was busy, and asked Durdin to prepare such a statement; that in this conversation Durdin said that he needed money and would like to get what was due him for royalties; that Thomas said he did not have any money then and did not know how much was due, but would take care of the matter later; that soon after, Durdin handed Thomas an itemized list showing sales of thirty switches and two bilge pumps, upon which he claimed that royalties amounting to $270 had accrued; that in August, 1908, Durdin paid Thomas $50 on account of these royalties; that in November, 1908, Thomas & Smith executed and delivered to Durdin a series of notes aggregating $220, being the $270 above mentioned, less the $50 paid in August, 1908; that appellant paid $205 additional, in items of from $10 to $50 each, all prior to March 30, 1909; that in June, 1909, Durdin requested payment of royalties which had accrued for the year ending July 1, 1909; that Thomas requested Durdin to wait ninety days, which he did; that in September following, Durdin again spoke to Thomas about the matter, but Thomas asked for further time, and later proposed to pay a part of what was due and give a note for the balance; but that Durdin declined to accept the note unless it was secured. Thomas denies most of these alleged conversations, but admits that payments were made as stated, that the notes for $220 were given, and that the consideration therefor was the accrued royalties; and admits that Durdin, in October, 1909, made a request for a settlement, and that he, Thomas, told Durdin he would "look the matter up and see where he stood." In view of this evidence, it would seem that appellant's present theory of the contracts was an afterthought. Be that as it may, we think the contracts, when examined closely, bear out the construction which the parties themselves gave them.

It will be noted that in both the royalty contracts

the consideration therein expressed is in substance as follows: "In consideration of the following royalties *to be paid for the use of*" the article specified *"we hereby agree to give"* an exclusive right to use, manufacture and sell the same "during the patent term." In our opinion, this language is fairly susceptible of the construction first, that an *immediate use* by appellant of the specified inventions of Durdin on the basis of the stipulated royalties was contemplated by the parties, and second, that it was further agreed that as soon as the patents should be obtained, appellant should have the *exclusive* right to use and manufacture the articles invented and patented. In the construction of contracts it is an elementary rule that the whole contract must be considered. The intention of the parties cannot be gathered from any one clause or provision standing by itself, but by so reading the several provisions as to give effect to all of them, if possible. To give the single phrase "during the patent term" the effect claimed for it, would be to ignore the language of the first part of the same sentence, as well as other provisions of the same contract. The contract speaks of "this license," as a thing granted *in præsenti,* while the "exclusive right to use, manufacture and sell * * * during the patent term," is something the inventor "agrees to give" when the patents shall have been issued, which shall be "as soon as possible." The use of the inventions is to be paid for by royalties; the exclusive right to manufacture under the patents will be included when the patents shall have been issued. The fact that the contracts required the first annual settlement to be made in July, 1908, is significant in this connection. It could not be definitely known, at the time said contracts were signed, that any patent could be secured prior to July 1, 1908; yet the first annual statement of royalties was required to be then made, whether patents had issued or not. This provision clearly contem-

plates the payment of royalties precisely as stated in the first sentence, viz: "for the use" of the inventions of Durdin, as well before as after patents should be obtained. This construction is consistent with the acts of the parties, while that suggested by appellant's counsel is inconsistent therewith. We, therefore, conclude that the trial court did not err in giving to the contracts a construction which not only gives effect to all the language of the contracts, but is borne out by the acts of the parties themselves.

It further appears that when appellant manufactured the bilge pumps it issued a catalogue containing the following guarantee: "We guarantee that nothing but the very best material for the purpose is used in the construction of our pumps, and the workmanship of same is thoroughly first class. And if, after ten days' trial, they do not prove as represented, pumps can be returned to us and we will cheerfully furnish another pump and pay the freight charges. We further agree to replace, at our factory, any parts giving out on account of natural wear, imperfections in workmanship or material that occur within one year from date of purchase, providing pump has received proper care." It was shown that several of the pumps sold to appellee, for the price of which this suit was brought, proved to be defective in workmanship or material; that as soon as such defects were reported, Weil notified appellee or its superintendent; that on some occasions attention was paid to such notices and on other more frequent occasions no attention whatever was paid; that Weil was obliged to, and did furnish materials, and employed and paid mechanics to remedy the defects. The trial court evidently considered with care and much patience the details of the evidence concerning these defects and repairs, and after such consideration, allowed to appellee $291.57 as the cost of making such repairs and remedying such defects as were fairly within the terms of the guarantee.

We, in turn, have carefully examined the abstract of the record and the briefs of counsel concerning this item, and without entering into a discussion of the numerous details, it will suffice to say that, in our opinion, the finding of the trial court in this respect was fully warranted by the evidence.

A number of minor propositions have been suggested, rather than insisted upon, in argument; but all of them are, we think, substantially covered by what has been said above. Finding no reversible error in the record, the judgment of the Municipal Court will be affirmed.

*Affirmed.*